UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
SONYA SUMMERS, MARY AUNG, IREYNE           :
YULI and SHAUNA STANDIFER,                 :     Civil Action No.:
                                           :
                    Plaintiffs,            :
                                           :     **COMPLAINT**
        v.                                 :
                                           :
MACY'S, INC.,                              :     **JURY TRIAL DEMANDED**
                                           :
                    Defendant.             :
------------------------------------------------------------------X

   Plaintiffs Sonya Summers, Mary Aung, Ireyne Yuli and Shauna Standifer (together, "Plaintiffs"), by and through their undersigned counsel, Wigdor LLP, as and for the Complaint in this action against Defendant Macy's, Inc. ("Macy's" or "Defendant") hereby allege:

**PRELIMINARY STATEMENT**

   1.  Macy's has a long and uncomfortable history of racial profiling. Unfortunately, by bringing these discriminatory practices to light, employees who dare to stand up to Macy's and speak up against such profiling are punished for doing the right thing.

   2.  After settling several high profile lawsuits and resolving governmental inquiries relating to incidents of racial profiling customers, Macy's agreed to post its "Customers' Bill of Rights" in prominent locations accessible to the public in its New York stores and on its website.

   3.  As part of its Customers' Bill of Rights, Macy's commits to providing all shoppers with an experience "**free from unreasonable searches, profiling, and discrimination of any kind**" in its stores.

   4.  Moreover, Macy's has told the public that it "strictly prohibits unreasonable searches and/or the profiling of customers by any employee. The participation by employees in

such activities or the failure to report such instances of which they have knowledge is a violation of company policy."

5. Despite these assurances, Macy's has not kept its promises to its customers or to the public.

6. Managers in Macy's Cosmetics/Fragrance Department in its flagship Herald Square store repeatedly directed Plaintiffs and other sales associates to racially profile customers of Asian descent by refusing to sell them products in the same manner that white shoppers were permitted.

7. This racial profiling of customers of Asian descent is based on the discriminatory stereotype that all Asian customers are resellers – that is, Asian customers buy goods in markets like the U.S. and resell them on the grey market at a markup in Asia.

8. When Plaintiffs complained about their managers' unlawful directions to racially profile, each was retaliatorily and summarily terminated from her employment with Macy's.

## NATURE OF THE CLAIMS

9. This is an action for declaratory, injunctive and equitable relief, as well as monetary damages, to redress unlawful employment practices committed by Defendant against Plaintiffs, including Defendant's unlawful retaliation committed against Plaintiffs due to their complaints of discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL") and the New York City Human Rights Law, N.Y. City Administrative Code §§ 8-101 *et seq.* ("NYCHRL").

## ADMINISTRATIVE PROCEDURES

10. Plaintiff Summers filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 30, 2017, alleging violations of Title VII. Ms. Summers received her notice of right to sue on June 12, 2017.

11. Plaintiff Aung filed a Charge of Discrimination with the EEOC on January 30, 2017, alleging violations of Title VII. Ms. Aung received her notice of right to sue on June 12, 2017.

12. Plaintiff Yuli filed a Charge of Discrimination with the EEOC on January 30, 2017, alleging violations of Title VII. Ms. Yuli received her notice of right to sue on June 19, 2017.

13. Plaintiff Standifer filed a Charge of Discrimination with the EEOC on January 30, 2017, alleging violations of Title VII. Ms. Standifer received her notice of right to sue on June 12, 2017.

14. Following commencement of this action, a copy of this Complaint will be served on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

15. Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

16. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiffs' rights under Title VII and Section 1981. The Court has supplemental jurisdiction over Plaintiffs' related claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

17. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

18. Plaintiff Sonya Summers is a former employee of Macy's. Ms. Summers was terminated from her position as a sales associate on or about April 7, 2016. She is a resident of the State of New York. At all relevant times, Ms. Summers met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

19. Plaintiff Mary Aung is an Asian American former employee of Macy's. Ms. Aung was terminated from her position as a sales associate on or about April 6, 2016. She is a resident of the State of New York. At all relevant times, Ms. Aung met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

20. Plaintiff Ireyne Yuli is an Asian American former employee of Macy's. Ms. Yuli was terminated from her position as a sales associate on or about April 6, 2016. She is a resident of the State of New York. At all relevant times, Ms. Yuli met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

21. Plaintiff Shauna Standifer is an Asian American former employee of Macy's. Ms. Standifer was terminated from her position as a sales associate on or about April 7, 2016. She is a resident of the State of New York. At all relevant times, Ms. Standifer met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

22. Defendant Macy's, Inc. is a Delaware corporation, registered to accept service of process in New York, specifically, at 80 State Street, Albany, New York 12207. At all relevant

times Defendant Macy's met the definition of "employer" and/or "covered employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

**Background**

23. Like many retail establishments, Macy's aims to protect the value of its products by preventing their unauthorized resale by "diverters" or resellers. In the Cosmetics/Fragrance Department, the Macy's "Multi-Unit Procedure" policy describes the procedures in place at Macy's to prevent such unauthorized resale by diverters.

24. Macy's "Multi-Unit Procedure" policy seeks to prevent "knowingly sell[ing] to diverters or resellers," by limiting the number of units of a single product, tracked by stock keeping unit ("SKU"), that can be sold to any individual customer or groups of customers. The policy prohibits more than six units of any single SKU to be sold to a customer unless the sale is approved by an associate, and in partnership with management.

25. In effect, managers at Macy's retain substantial discretion over the sale of goods to customers within their departments.

26. The managers in the Cosmetics/Fragrance Department at Macy's, however, have put their own discriminatory and unlawful twist to this policy.

27. Plaintiffs and other sales associates were verbally instructed that the "Multi-Unit Procedure" policy was to be applied to most customers as written.

28. However, to customers of Asian descent, managers in the Cosmetics/Fragrance Department at Macy's instructed Plaintiffs and other sales associates only to sell one unit per SKU. As described below, Plaintiffs were required to enforce this racially discriminatory policy and were subjected to unlawful retaliation when they complained about it.

**Sonya Summers**

29. Macy's hired Ms. Summers to work at the Clinique counter in or about 2009.

30. In or around 2013, she transferred to the La Mer counter.

31. Throughout her tenure at Macy's, Ms. Summers was directed to racially profile by her managers.

32. By way of example only, in or about May 2012, Ms. Summers attended a daily morning meeting with other Macy's employees where her manager, Janine Grippo, told the employees, "Don't sell to Chinese [customers]."

33. When Ms. Summers objected before the group and told Ms. Grippo that she was encouraging racial profiling and discrimination, Ms. Grippo "shushed" Ms. Summers and told her to be quiet.

34. Even when interacting with Macy's customers, Ms. Grippo's racial animus was evident. Ms. Summers observed Ms. Grippo routinely denying customers of Asian descent gifts that they otherwise should have received for purchasing certain cosmetics or fragrances, and call security or loss prevention on them and demand to inspect their bags after they had made their purchases.

35. Ms. Summers was never required to take part in – nor did she observe – similar conduct affecting customers not of Asian descent.

36. When Ms. Summers transferred to the La Mer counter, the direction to racially profile continued.

37. Due to La Mer's popularity in Asia, many of Ms. Summers's clients were of Asian descent.

38. Because of the higher percentage of customers of Asian descent, Ms. Summers was frequently told at the La Mer counter that she should "look out for" and "not sell to" customers of Asian descent.

39. In addition, Bianca Carson, an assistant store manager, placed a further limit on the Multi-Unit Procedure Policy. While La Mer executives told Ms. Summers and other sales associates that they were permitted to sell up to six units per SKU to customers, Ms. Carson prohibited sales associates, including Ms. Summers, from selling more than one unit per SKU to any customer of Asian descent at the La Mer counter.

40. In or about November 2014, Ms. Summers witnessed additional evidence of racial animus by Macy's managers. While one sales associate was working with a family from China looking to purchase La Mer gifts for relatives, Ms. Summers witnessed Michael Brady, Macy's head of security, rush over to a nearby counter.

41. During the remainder of the transaction, Mr. Brady conspicuously watched the family, making both the family and the La Mer sales associate feel uncomfortable.

42. Eventually, one of the family members asked the sales associate why Mr. Brady was staring at them.

43. It was clear to Ms. Summers that Mr. Brady was profiling the customers, but she did not feel comfortable stating so as he was still standing nearby.

44. After the transaction was completed, but while the products were still being gift-wrapped, Mr. Brady approached the La Mer counter and demanded a duplicate of the receipt.

45. In or about January 2015, also by way of example only, Ms. Summers and Ms. Yuli were conducting a transaction at the La Mer counter with two individuals of Asian descent who had mentioned that they were in New York on a business trip from China.

46. As Ms. Summers was ringing up the purchase, Myra Aguilera, an assistant store manager in the Cosmetics/Fragrance Department, came over to Ms. Summers and Ms. Yuli and stated, in front of the customers, "Remember, Sonya, how many SKUs you can ring [up]," reminding Ms. Summers that there was a different limit for customers of Asian descent than for non-Asian customers.

47. The discriminatory behavior continued as Ms. Aguilera then accused the woman of having shopped at the La Mer counter previously, despite the woman's insistence that she was traveling from abroad and had never been to Macy's Herald Square before.

48. Despite the woman's protests, Ms. Aguilera continued to badger the customer, even after the transaction was completed.

49. After the customers completed their La Mer transaction, Ms. Aguilera followed them to the Jo Malone counter, which was right next to the La Mer counter.

50. Ms. Aguilera proceeded to hover as the customers continued to shop.

51. As one of the customers was making a purchase, Ms. Aguilera questioned the Jo Malone sales associate about the purchase.

52. By way of further example only, in or about March 2016, Ms. Summers was assisting a man of Asian descent who was from China in purchasing La Mer products for his wife and daughter.

53. Throughout this transaction, a business manager at Tom Ford, Russo Julian Albuja, came over and conspicuously stared at Ms. Summers and her customer.

54. When the customer had finished selecting the products he wanted to purchase and went with Ms. Summers to the register, he asked Ms. Summers why he was being stared at.

55. Despite Ms. Summers' mortification and knowing that the customer was being scrutinized because of his Asian descent, she told the customer that she did not know why he was being stared at.

56. Ms. Summers complained verbally to her managers on a regular basis about their directives to racially profile.

57. Ms. Summers also complained about this conduct numerous times in writing during her employment.

58. Ms. Summers filed written grievances with the Macy's union – Local 1-S, describing her managers' unlawful conduct and encouragement to racially profile customers of Asian descent.

59. Upon information and belief, these grievances were forwarded to Macy's management. Despite knowledge of these complaints, Macy's' management made no efforts to remedy the racial profiling.

60. On or about March 21, 2016, Ms. Summers was suspended from Macy's for the vague and unsubstantiated reason that she had "violated policy."

61. When Ms. Summers asked what policy she had allegedly violated, a Human Resources employee, Tambita Yonas, refused to elaborate and simply told her, "You should know."

62. Ms. Summers was unaware of the policy she purportedly had violated.

63. On or about April 7, 2016, Ms. Yonas terminated Ms. Summers' employment over the phone for a vague and unsubstantiated allegation of "keying in," or manually entering credit card numbers without first confirming a customer's identification using photo identification.

64. Upon information and belief, there is no written policy prohibiting keying in card numbers.

65. Ms. Summers never received a written policy stating that keying in card numbers was not permitted.

66. Upon information and belief, and in Ms. Summers' experience, keying in card numbers is a routine practice, as the cash registers at Macy's permit this action.

67. On at least one occasion, Cosmetics/Fragrance Department Vice President Cheryl Fordham directed Ms. Summers to key in Ms. Fordham's card number to facilitate a purchase.

**Mary Aung**

68. Macy's hired Mary Aung to work in the Cosmetics/Fragrance Department in or about September 2013.

69. Ms. Aung's managers subjected her to a racially hostile work environment and directed her to racially profile Asian customers.

70. Moreover, Macy's asset protection employees interrogated Ms. Aung about sales to Asian customers.

71. One asset protection employee approached Ms. Aung, placed his personal cell phone in front of her and displayed several images of Asian individuals.

72. The asset protection employee asked Ms. Aung, "Do you know these people?"

73. When Ms. Aung responded in the negative, the asset protection employee declared, "These are *bad* people."

74. Of course, Ms. Aung did not know who any of the individuals were, much less whether they were "bad."

75. The asset protection employee then instructed Ms. Aung to refrain from selling to these purported "bad people," all of whom appeared to be of Asian descent.

76. In addition, when Ms. Aung would complete transactions with Asian customers, her managers would ask her, "Why are you selling to *these people*?" which she took to refer to the race of the customers.

77. The managers never made similar comments about non-Asian customers.

78. Ms. Aung made numerous complaints about her managers' racially discriminatory conduct.

79. Ms. Aung orally complained to her union representative and her managers about this unlawful conduct and the hostile work environment it created.

80. Despite these complaints, no action was ever taken to remedy this situation.

81. On or about March 18, 2016, after complaining about her supervisors' unlawful conduct, Ms. Aung was suspended from her position.

82. On or about April 6, 2016, Ms. Yonas terminated Ms. Aung's employment over the phone for allegedly "breaking the company's rules."

83. When Ms. Aung asked which rules she had violated, Ms. Yonas refused to provide an answer.

**Ireyne Yuli**

84. Macy's hired Ms. Yuli in or about 2014.

85. During her one and a half year employment, Ms. Yuli's supervisors subjected her to a vile and discriminatory work environment.

86. Specifically, one of Ms. Yuli's managers, Krystin Phillips, would intently scrutinize her work any time a customer of Asian descent would approach her counter.

11

87. Several times while Ms. Yuli was working with customers of Asian descent, Ms. Phillips would call the loss prevention department at Macy's to send an employee to watch the sales associate and customer through the completion of the transaction as means of additional scrutiny.

88. Not only did the conspicuous staring make the customers uncomfortable, but also it made Ms. Yuli uncomfortable.

89. Ms. Yuli's managers would approach her to explain that she should not sell products to customers of Asian descent for a period of more than 90 days after their most recent transactions.

90. Ms. Yuli's managers never made similar warnings regarding transactions with white customers.

91. This occurred three to four times per week throughout Ms. Yuli's employment.

92. Because Macy's did not keep a list of the individuals who purchased from the Cosmetics/Fragrance Department or pictures of these individuals, the only way the managers could identify the alleged "repeat" customers was by their race or national origin.

93. Ms. Yuli complained about the managers' discriminatory conduct and practices at least once per month for the duration of her employment.

94. Furthermore, Ms. Yuli filed at least two grievances with Local 1-S that detailed the discriminatory conduct to which she had been subjected.

95. Upon information and belief, these grievances were forwarded directly to management.

96. Despite Ms. Yuli's complaints, Macy's did not take any action to remedy the discrimination or hostile work environment.

97. On or about March 18, 2016, Ms. Yuli was detained by Macy's security for approximately one hour.

98. During her detention, she was wrongfully accused of: (i) permitting $20,000 of fraudulent purchases in one day; (ii) stealing a gift card; and (iii) ringing up transactions under another associate's account.

99. An individual in the security division of Macy's demanded that Ms. Yuli sign a statement admitting to these allegations, but she refused.

100. The next day, Ms. Yuli was suspended without pay.

101. When Ms. Yuli requested an explanation for her suspension, she was told that she had suspiciously looked up accounts.

102. This suspension, however, was completely unjustified because Ms. Yuli had followed the appropriate protocol and the alleged account look-up was never completed.

103. On or about April 6, 2016, Ms. Yonas terminated Ms. Yuli's employment over the phone for allegedly not securing the accuracy of a transaction, without specifying which transaction was unsecured.

**Shauna Standifer**

104. Macy's hired Ms. Standifer to work at the La Mer counter at Macy's on or about September 22, 2013.

105. During her employment at Macy's, Ms. Standifer's managers subjected her to discriminatory conduct.

106. Specifically, Ms. Standifer was subjected to increased scrutiny by her managers each time she interacted with Asian clientele.

13

107. Ms. Standifer's managers informed her that, despite the Macy's Multi-Unit Procedure Policy, all customers, excluding those of Asian descent, would be permitted to purchase up to eight items of the same SKU. Customers of Asian descent, however, would be limited to fewer than six products per SKU.

108. On another occasion, Ms. Standifer attempted to charge the Macy's credit card of a male customer of Asian descent who was purchasing from her counter.

109. When the Macy's card did not go through, the customer stepped away to make a phone call to inquire about why the card had been declined.

110. As Ms. Standifer waited for an explanation, a manager from the Clarins counter, Linda, approached her and inserted herself into the transaction.

111. When the customer returned to the counter, Linda sarcastically said, "Oh – look he's back."

112. When Linda attempted to engage the customer and the customer gave her a signal to indicate that a phone call was ongoing, Linda indignantly remarked to Ms. Standifer, "Did he just tell me to leave?"

113. When the customer finished the phone call, Linda continued to insert herself into the transaction, causing Ms. Standifer great discomfort and the customer noticeable agitation.

114. On another occasion, Macy's Herald Square's District Vice President, Patti Lee, remarked to Ms. Standifer and Ms. Yuli that an Asian customer purchasing La Mer products was "young to be buying La Mer," implying that the purchase was suspicious.

115. The managers and other supervisors at Macy's have never made these comments about non-Asian customers.

116. During Ms. Standifer's employment, she made several complaints about the discriminatory conduct and directives to racially profile to both her managers and the union.

117. Despite these complaints, no action was ever taken to remedy this situation.

118. On or about March 19, 2016, after Ms. Standifer had complained about her manager's conduct, Macy's security escorted her to a back room where they interrogated her for nearly three hours.

119. Macy's security falsely accused Ms. Standifer of assisting in making a fraudulent purchase.

120. Macy's presented Ms. Standifer with a statement that "admitted" her complicity in the fraudulent scheme, but she refused to sign it.

121. Ms. Standifer was subsequently suspended.

122. A few days later, Ms. Standifer received a letter from Macy's containing a promissory note that she was asked to sign agreeing to repay Macy's $5,692, the amount allegedly lost in the fraudulent transaction.

123. Again, Ms. Standifer denied these allegations and refused to sign the note.

124. On or about March 28, 2016, Ms. Standifer received a threatening voicemail from a debt collection agency seeking to recover the amount she allegedly owed to Macy's.

125. On or about April 4, 2016, Ms. Yonas told Ms. Standifer that the promissory note she received was sent in error.

126. Only three days later, however, Ms. Standifer was terminated for purportedly "violating policy."

127. When Ms. Standifer requested a reason for her termination in writing or a written acknowledgment that the promissory note was sent to her in error, Ms. Yonas refused to provide this and, instead, directed Ms. Standifer to call a toll-free number.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Retaliation in Violation of Title VII)

128. Plaintiffs hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

129. Defendant has retaliated against Plaintiffs for engaging in the protected activity of complaining about being forced to racially profile customers of Asian descent by, *inter alia*, suspending and terminating their employments.

130. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Title VII, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm for which they are entitled to an award of monetary damages and other relief.

131. As a direct and proximate result of Defendant's unlawful and retaliatory conduct in violation of Title VII, Plaintiffs have suffered, and continue to suffer, severe mental anguish and emotional distress for which they are entitled to an award of monetary damages and other relief.

132. Defendant's unlawful retaliatory actions constitute malicious, willful and wanton violations of Title VII for which Plaintiffs are entitled to an award of punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Retaliation in Violation of Section 1981)

133. Plaintiffs hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

134. Defendant has retaliated against Plaintiffs for engaging in the protected activity of complaining about being forced to racially profile customers of Asian descent by, *inter alia*, suspending and terminating their employment.

135. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Section 1981, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm for which they are entitled to an award of monetary damages and other relief.

136. As a direct and proximate result of Defendant's unlawful and retaliatory conduct in violation of Section 1981, Plaintiffs have suffered, and continue to suffer, severe mental anguish and emotional distress for which they are entitled to an award of monetary damages and other relief.

137. Defendant's unlawful retaliatory actions constitute malicious, willful and wanton violations of Section 1981 for which Plaintiffs are entitled to an award of punitive damages.

### AS AND FOR A THIRD CAUSE OF ACTION
**(Retaliation in Violation of NYSHRL)**

138. Plaintiffs hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

139. By the actions described above, among others, Defendant retaliated against Plaintiffs for engaging in the protected activity of complaining about being forced to racially profile customers of Asian descent in violation of the NYSHRL by, *inter alia*, suspending and terminating their employment.

140. As a direct and proximate result of the unlawful retaliatory conduct committed by Defendant in violation of the NYSHRL, Plaintiffs have suffered, and continue to suffer, monetary and/or other economic harm for which they are entitled to an award of monetary damages and other relief.

141. As a direct and proximate result of the unlawful retaliatory conduct committed by Defendant Macy's in violation of the NYSHRL, Plaintiffs have suffered, and continue to suffer, severe mental anguish and emotional distress for which they are entitled to an award of monetary damages and other relief.

## AS AND FOR A FOURTH CAUSE OF ACTION
**(Retaliation in Violation of NYCHRL)**

142. Plaintiffs hereby repeat, reiterate and re-allege each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

143. By the actions described above, among others, Defendant retaliated against Plaintiffs for engaging in the protected activity of complaining about being forced to racially profile customers of Asian in violation of the NYCHRL by, *inter alia*, suspending and terminating their employment.

144. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, monetary and/or other economic harm for which they are entitled to an award of monetary damages and other relief.

145. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, severe mental anguish and emotional distress for which they are entitled to an award of monetary damages and other relief.

146. Defendant's unlawful retaliatory actions constitute malicious, willful and wanton violations of NYCHRL for which Plaintiffs are entitled to an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays that the Court enter judgment in their favor and against Defendant for the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States, the State of New York and the City of New York;

B. An award of damages against Defendant, in an amount to be determined at trial, plus interest, to compensate Plaintiffs for all monetary and/or economic damages;

C. An award of damages against Defendant, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiffs' emotional distress;

D. An award of punitive damages in an amount to be determined at trial;

E. Prejudgment interest on all amounts due;

F. An award of Plaintiffs' reasonable attorneys' fees and costs; and

G. Such other and further relief as the Court may deem just and proper.

19

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues of fact and damages stated herein.

Dated: September 7, 2017
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
Douglas H. Wigdor
Elizabeth J. Chen
Kenneth D. Sommer

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
echen@wigdorlaw.com
ksommer@wigdorlaw.com

*Attorneys for Plaintiffs*